Case of the morning. And the only case of the morning. 217-0708, Red Door Spa Holdings, Inc v. IWCC Counsel, you may proceed. Speak up a little bit. That's really just for recording, not so much for amplification. Understood. Judges, obviously the issue before this panel is whether the commission's decision in awarding the defendant wage differential benefits in this case pursuant to Section 18.1 is both erroneous as a matter of law and erroneous as a matter of the weight of the evidence. Your Honors, I submit to you that the decision is erroneous as to both counts. First, as to whether a petitioner or the defendant, as a matter of the word, full duty without any work restrictions for approximately two years and four months after her work accident before she volunteered to resign should be entitled to a wage differential. Well, hang on a second. Wasn't there medical evidence that her resignation was due to the claimant's lingering ill effects, injuries from the accident? If there was, Justice Hudson, it was well after the point that Ms. Sauer voluntarily resigned. So you're saying there was no medical evidence to support the fact that she had to resign? At one point, I believe, but prior to the time that she voluntarily resigned, there was an indication to a suggestion by one of her treating physicians to limit her work or limit her hourly work activities during the day. Her testimony, her direct testimony at trial, indicated that she had a lot of time in her actual schedule relative to meetings and events. She was allowed to, during the day, to get massages during the work day. She was allowed to take breaks. Essentially, any sort of issues that she was receiving to have been experiencing as a result of the accident, everything was being accommodated by the employer. Who's Dr. Oken? Dr. Oken, I believe, is one of Ms. Sauer's treating physicians. He instituted permanent work restrictions, 20 hours per week. No lifting, pushing, or pulling more than 10 pounds. Dr. Oken testified that the claimant's medical condition and permanent work restrictions were related to the October 2, 2008 automobile accident. Is that true? I believe that is true, yes. So would that not support the commission's decision? Again, it is well after the point that Petitioner voluntarily resigned. The commission's decision, obviously, in following along with the arbitrator's decision, is clearly inconsistent in that while Ms. Sauer failed to prove her entitlement to temporary benefits, and the reason for that is that it was tantamount to refusing light duty work or refusing work within restrictions that were being accommodated. That very same analysis, that very same justification should follow to why she's not entitled to a wage differential. I think the more appropriate reward in this case, nobody's saying that she's not entitled to benefits. There's no indication that she was not a traveling employee at the time of the accident. She clearly had an accident that arose out of it in the course of employment. However, I think the more appropriate determination should have been under Section 82. And again, the same basis that the arbitrator indicated that Ms. Sauer was not entitled to temporary benefits, that should follow to the determination as to why she's not entitled to a wage differential. And the reason for that, however, is that Ms. Sauer failed to satisfy the first element of being entitled to a wage differential because her own testimony proved that the only thing that was preventing her from continuing her usual customary line of employment was the fact that she voluntarily resigned. And again, that's two years and four months after the accident. Was it the testimony of evidence that proves that during that entire two-year period, she was treated constantly for injury sustained in a car crash? I mean, she was treated in order to stay employed, the marriage, the family. She was treated. I certainly don't want to get into the mind of Ms. Sauer. But yes, to answer your question, she was treated during that time period. It also is noted, I believe in the records, and I think it's indicated in both our briefs, she did have, obviously, an unrelated cancer diagnosis. So she only missed two days of work based upon the accident. The two days immediately following the motor vehicle accident were the only two days that she missed until the day that she voluntarily resigned. So there was, I believe, a period of time where she was obviously off from work due to cancer treatment. I mean, we understand your argument. And actually, I like your argument because it has some intuitive appeal, except you're glossing over. Your argument very simply is she shouldn't receive it because she, herself, voluntarily resigned from her position. She did. Well, what about if somebody lost a leg and then they decided they couldn't work? Would your position be they voluntarily left? See, you're tending to leave out part of the equation as was there a legitimate reason, I think is an important part of the equation, why she left the job. You're saying if somebody voluntarily decides to quit, it doesn't matter whether they can do the job or not, they voluntarily left. Do you see the problem with that logic? There's a missing element in your argument. Well, I think there's another element in that. I think the timing is important, first and foremost. And the second point is that if there was somehow any sort of bad faith on behalf of the employer, if there was any indication whatsoever that they were not allowing her to take these breaks or not allowing her to otherwise have accommodations to do the job that she was doing, it would be a completely different analysis. It would be a completely different situation. How do you think we'd be here? Well, and I think that's a legitimate point. But I think what it's going to come down to is, is there sufficient evidence in the record to support the argument that because of the effects, because of the effects of the accident, there were legitimate reasons compelling her to retire. So, I mean, I just, I think that's, the totality is involved beyond the mere fact that she left. I understand your point. And while you're arguing that, and I understand he's probably going to argue it's more simple, it's not as simple as that. When did she leave? What was the date that she quit work? The formal date that she voluntarily resigned was February 11th of 2011. Of 2011? Yes. There's also, there's a three-month period for, if I remember correctly, and I apologize, there was a, she gave her, she gave her employer essentially a three-month, I'm planning on resigning, I don't think. Very much notice. Yeah. She said specifically, she felt, and this was during the protest, but she felt that her employer deserved someone fully present. I don't really know what that means. Obviously, that's her justification. She was asked on both the record, on cross-examination, whether her employer was doing anything that would prevent her from continuing her full-duty position. She testified that they were not. They were accommodating everything. It was a dream job. She indicated that specifically. All right. So, you're not yet arguing the voc rehab evidence would support there was an impairment of earnings, right? You're not necessarily getting into that part of it? I mean, yes, that's well after the fact that she voluntarily resigned. I mean, I think it turns into a public policy argument, and I kind of want to hit this home. The employer did everything right. Tried to accommodate her, tried to do as much as you could. Exactly. So, I mean, when you turn to the actual, with the medical documents, the medical evidence that happens well after the point that she voluntarily resigned, there's not any indication that at the time that she voluntarily resigns, February 11, 2011, she's working her full-duty job. The job description of her actual job duties is part of the record. There's no indication that she's required to lift tables or she indicated specifically that she can move stuff around. She has a good team behind her. She has a lot of help. She has a lot of autonomy. Essentially, she can do what she wants. She's in a very good position. Isn't it true, though, you used your statement, and I don't think we disagree, that, yeah, the employer did everything that we would want an employer to do in terms of accommodate an injured worker. But by the same token, on the other side of the coin, this worker did everything we would want a worker to do to, you know, work as long and as faithfully as they could for the employer. Of course. Okay. And I think she testified on both of those things out there. Both parties did everything they could. And what is the reason for the end result? Perfect question. The reason for the end result is, and again, it's an issue of timing. I think if there's an indication directly in the medical records at the time that she voluntarily resigned, like you need to, whatever, if there's any specific restrictions, she takes the list of the employer. The employer says, yeah, you're right. We can either accommodate those restrictions or we can't. That's it. Well, the employer was accommodating the restrictions. Yes, they were. Right. But the point is it comes down to whether there's sufficient evidence to show or establish that the medical condition necessitated the retirement, notwithstanding the restrictions. Right? I mean, that's going to be the ultimate decision. Of course. I mean, clearly the medical evidence, there are competing opinions, just like in every case. The defendant's experts, I think the ultimate decision is that the restrictions that are indicated were not permanent in nature. Eventually, maybe they would get better. But, again, I think that's probably speculative. But, again, the ultimate point, and obviously you kind of hit the nail on the head previously, all that stuff happens afterwards. When did Dr. Oken put a permanent restriction of 20 hours per week on her? What was the date? I believe that Dr. Oken indicated those restrictions. In October of 2011, she's restricted to six hours a day by Dr. Mayo Ford. I think that's October. I don't know specifically the date. It's October of 2011. In May of 2011, at Mary Ann Joy, she's got 10-pound lifting restrictions. And, again, that's well after the time that she volunteered to file. To answer your question, I'm not exactly sure. I thought Oken had a report dated April 13, 2013, in which she noted the diagnosis, the chronic pain, and instituted permanent work restrictions. I think that clearly would imply or indicate that it was April 13. April 13 of 2013. Right. So, again, that's almost five years after the accident. But it was before. How long did she hang in there after that report? After that report? She volunteered to resign in February of 2011. Okay. So that's two years. She volunteered to resign almost two years before that. So, again, that's kind of where the time frame comes in. I mean, again, if there was—I don't want to try to speculate as to what my argument would be if the time period was a little closer, but it wasn't. In fact, the matter was she continued to work her full-day job. But were those permanent restrictions, nevertheless, were in place when she retired or resigned, according to you? No, they were not. They were not? They were not. Again, the indication by Dr. Oken in 2013 would have been it would take almost two years after the day that she volunteered to resign. Dr. Chedia recommended a reduction in work schedule before she volunteered to resign. Yes, yes. A 50 percent. You recommended a 50 percent reduction, didn't you? At one point, it was 20 percent. And I believe at some other point, and I'm not exactly sure of the time frame, there was a recommendation for 50 percent. Well, that's pretty significant. She did refuse. She testified, I think, that he recommended 50 percent, but she pushed back and got him to sign for 20 percent. That's correct. And, again, no indication of this. No indication the respondent was not able to accommodate. They did. And so your answer is to kind of tie this in. I think the, and I kind of hinted on it already, the commission's decision is clearly consistent in that while she was not entitled to temporary benefits due to the fact that she volunteered to resign, again, that same analysis, the same logic should flow because she failed to not only satisfy the first element of being entitled to a wage differential because she volunteered to resign. I mean, she was able to continue to perform her usual customary line of employment after the accident because she did it. She did that. She did that work. She failed in the second prong that her own actions of continuing to work, and, again, this is great for everybody, but she continued to work her full duty without restrictions for nearly two and a half years after the work accident. And it shows that she was not, she didn't have her earnings impaired because she was making the same... Well, let me ask you this. She testified at the hearing, right? I'm sorry? She testified at the hearing, did she not? She did, yes. And did anyone ever bother to ask her why she was resigning? She testified specifically that she felt that the employer deserved someone fully present. Okay, so obviously she indicated it was because of the lingering effects of the accident, right? That is what her testimony was. And apparently it appears in the record that the commission found her to be credible in that. I think she was credible. I was actually present at the original hearing. I thought she was credible. Counsel, you have time in reply. Thank you. Pardon? Can you repeat that? I'm sorry. Oh, you have time in reply. You have five minutes in reply. That's fine. No, no, no, not now. Opposing counsel gets five. Then you reply. That's fine. Hey, you think if we could just offer you more time, you're going to take it, right? Yeah. Yes. Yes. Yes. Yes. Yes. You can sit. May it please the Court. My name is Michael Block. I'm the attorney for the, I can follow up as a petitioner, but as a defendant in this case. This is a review of the unanimous decision of the commission on what we call the next great AP1 wage deferential award. The reason it's the next great is the job she was able to get. We are looking at what the next great is a lot of wage deferential award, which is the state's average wage at the time of the announcement. So I would say this is a very exceptional day. I can't remember, and I've been doing this a long time, representing a higher quality worker than this woman. And it's not just because, she's not exceptional just because she had this great job. Now I pay $140,000 a year, up to a 20% bonus. So she was in the $150,000, $160,000 a year range. And what she was made for, she had exceptional talent, exceptional work ethic. I think an exceptional employer-employee relationship is a worn out idea, but it's exceptional integrity. And she actually came to this case for a respondent with an exceptional gift, which is a $300-some-thousand credit that they get in the workers' compensation case because the insurance company threw the other driver, who was negligent, paid a half a million dollars to settle that claim. And other than the recovery fee of the 25% proportional cost, they get an entire credit for it, which to be honest, the arbitrator found they didn't put in enough evidence for it. The commission found the category, and I think there was enough record for it. Can you hone in on the medical reasons or the specific reasons that justified her retiring? He says that she hung in there for two years. There was really no problem. She just up and voluntarily decides to retire, so why should we pay anything? Well, that is the argument. Well, tell us what that argument doesn't carry today. Okay. First of all, I was, in answer to your question, the first time she saw Dr. Chatterbury, and I probably butchered his name a little bit, that was in November of 2010 before she quit and before she left. And she was clearly struggling at that time, and they work out of the years. You've got massages, tick breaks, whatever. But she was clearly struggling at that time. And Dr. Chatterbury said, you need to reduce your workload by 50%. And she basically said, you can't do this job 50%. Let's make it 20%. So she's trying to ‑‑ she's not jumping on that to get out of the job. She's trying to hang in there because she does it the way she likes the job. It's her dream job. It really is. It's a wonderful job. And anything she can get beyond that once she leaves is making up for lost time. And the saddest part is, based on how high the salary is, there's nothing in the condition of this court to really even make up two-thirds of the difference. That's not going to happen. Okay, so she's struggling. The doctor shot whatever his name is. He supports her 50%. She says, I can't do the job. She gets him to modify it to benefit the employer so she can hang in there. That's exactly right. So then what happens is it finally causes her to leave. She realizes she's not there full time. And at that stage, she leaves in February. And the following month, she's in a five‑week, 21‑working‑day pain program with Dr. Hogan. So this is not a long period of effort. And he spends a lot of time with her, so I couldn't imagine a more credible witness. He's the director of the pain program at Marion Joy. And he finds the motion to work is 20 hours a week, and your working restrictions should be less than sedentary. In other words, alternate shifts, 10 hours a week, and only 20 hours a week. So with those restrictions in Marion, I think he wants to determine the time to carry it. Clearly, she can't work in that job. I mean, one combination of the responsibilities here is you're welcome to work here for 20 hours a week on $40,000 a year and 20% bonus. And to be honest with you, this is the type of thing people try to impose on themselves. And I'm not faulting anybody for it. I mean, this is a lady of great integrity. I mean, she saw three doctors for the responders. She saw a vocational counselor for the responders. She saw multiple training doctors. That one person in this case is a devil to say the least. So I think the two issues raised in this case are really, number one, is this a development review? And I don't think you need to hear my arguments on that because it's not a development review. This is basically what this is going to show. And, number two, is it suggesting that this way the evidence in the Sheriff's record is there? Nothing to find that supports it. And the answer is you don't have to search very far. Because the more important thing, I think, in this case is the doctor's restrictions and the vocaries as of the time of hearing. That's when the right to a wage differential was determined. And if you believe, if the commission believes Dr. Baldwin supports a wage differential, and he does, then I think she's entitled to a wage differential award. Well, I think the vocational evidence, too, there were two reports submitted in the evidence. One was Susan Eckenberg's. I described it at a brief at page 12. And she, for one, really did a job analysis. And her analysis of the job was what was called a life job, which involved some physicality. And she testified there was some physicality involved in the job. Her restrictions were not even sedentary. They were both sedentary because she couldn't even sit for more than half an hour because she was a chronic pain patient, unfortunately. And her restrictions were 20 hours a week. So you actually, Judge, have both a qualitative partial incapacity to perform duties, and that her duties were light and she couldn't even do sedentary. And you had a quantitative, and she could only do 20 hours a week instead of 40. So I think that more than adequately proves partial incapacity was the first element. The second was loss of earnings. When you look at the vocational evidence of either of the two experts who testified, Ms. Eckenberg said that the most, Ms. Eckenberg described four specific jobs from about $1,000 an hour to not quite $30 an hour and said the best she can do is 20 hours a week, $30 an hour. The other person, Mr. Stephan, said the best she could do is half of her wages. I don't think that's why I asked the opposing counsel. I don't think he's contesting the voc rehab evidence. Well, it shows loss of earnings, which is the second element. So the only thing that he's contesting is partial incapacity. And I'm here, and I think the evidence is overwhelming. You're saying there's sufficient evidence to support that. I am. All right. And I don't know how much longer we're going to be here. I don't plan to say any more things, but I'm lasting until you get out of here. And I think this, I think the one thing we can all agree on, I think, I think the counsel can do that. But for the rest of her life, she's still going to be working with her dream job, and she's going to have to rely on basically the commission for her wage differential. It's a very sad situation. It's kind of a reminder that every day you step out behind the wheel, you should be careful because you never know on Sunday, the driver's going to come along and your whole life is going to change. So on that note, I want to wish everybody safe travels home. Thank you. Thank you, counsel. Counsel, you may reply. It's a very good thing. What is an employer supposed to do in this situation? You were talking about the 20% limit on hours. The evidence, the testimony is devoid of any request. She never asked. She never asked anybody from the employer. So, like, hey, I've got these 20-hour per week restrictions or reduce my hourly to 20%. She never asked. So what is an employer supposed to do in a circumstance like this where she takes it upon her own volition to voluntarily resign at a point where the employer is doing everything necessary to accommodate any sort of restrictions that she has? I mean, I think this case presents an opportunity to essentially right or wrong what the Commission did. They didn't follow their own precedent in a situation very similar to this for all intents and purposes that punishes an employer for doing the right thing by accommodating an employee. So, like you said, he could argue the other side of the coin. Sometimes the cases talk about that. Otherwise, wouldn't she be punishing the employee who actually hung in there and did something that we rarely do? She was taking less restrictions to be able to continue the job. How often do you see that? That's a good question. It is a good question, isn't it? It is a good question. I don't think there's – there's nothing in that – nothing in the record I can certainly submit to everything the counsel says about her and my limited activities with her, but she testified credibly. So the result may not be anybody's fault. She also testified credibly that she voluntarily resigned and nothing was preventing her from continuing to work at the time that she voluntarily resigned. I think that's the opening point. Thank you, Your Honor. Thank you. Well, thank you, counsel, both, for your fine arguments in this matter this morning. For the record, you will note that Justice Harris is not here this morning to hear live your oral argument. He does have the full benefit of your oral argument because it is recorded. He will be listening to your oral argument and considering it along with the written briefs and the record and will be a fully participating member of this Court in rendering a decision. A decision will issue, a written decision will issue.